**Anthony E. PERRY, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–962.

United States Court of Veterans Appeals.

Feb. 22, 1996.

Craig M. Kabatchnick, Washington, DC, was on the pleadings, for appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; Adrienne Koerber, Deputy Assistant General Counsel; and Vito A. Clementi, Washington, DC, were on the pleadings, for appellee.

Before FARLEY, HOLDAWAY, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Vietnam-era veteran Anthony E. Perry, appeals a July 1, 1994, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to service connection for a heart disorder. Record (R.) at 6. The appellant filed a motion to remand and a reply, and the Secretary filed a motion to remand and a response. For the reasons that follow, the Court will vacate the BVA decision and remand the matter to the Board for further development and readjudication consistent with this opinion.

## I. Background

The veteran served on active duty in the U.S. Army from May 1966 to April 1968. R. at 14. An October 1965 preinduction medical examination report listed "normal" for "heart" and recorded a blood pressure of 120/74. R. at 31–32. On the induction medical history report, the veteran stated that he had never experienced "dizziness or fainting spells" or heart problems. R. at 33. A January 30, 1967, Army clinic outpatient record noted that the veteran gave a history of sporadic dizziness with occasional fainting since age sixteen. R. at 42. On January 9, 1968, he was evaluated at an Army facility in Germany for two episodes of dizziness and blurred vision, one "occurring [the previous day] just prior to [the patient] suffering a fall down the steps." R. at 41. A January 11, 1968, medical consultation report recorded a blood pressure reading of 143/96 and a "[history] of syncope per [commanding officer] at unit, but [patient] denies this", and stated that the first episode had occurred "after a day in the sun [when] he became lightheaded and nauseated" and the second three days later when he "fell—caused by stepping on [a] floor covered [with] diesel fuel." R. at

39–40. The diagnostic impression was "no disease or disorder". R. at 40. The veteran's April 1968 separation examination report did not note any abnormality as to the heart. R. at 52–53.

The veteran was treated at a private hospital in September 1988 for a heart attack and hypertension. R. at 65. He filed with a Department of Veterans Affairs (VA) regional office (RO) an April 1989 application for VA disability compensation or pension for a heart disorder. R. at 60–61. In his application, he stated that he was unemployed, had no income, and had applied for Social Security benefits in January 1989. R. at 63. An October 1989 VARO decision denied service connection for "blackout spells" on the grounds that they had existed prior to service and were not aggravated by service. R. at 91. The RO also found his cardiovascular disease to be not service connected, and rated it 60% disabling. *Ibid.*

The veteran appealed to the BVA. R. at 93, 99–100. He submitted a January 1991 letter from a private physician, Dr. Dalal, who stated that he had treated the veteran since September 1988 for heart disease and hypertension, and that the veteran had been diagnosed by Dr. Adams as having Adams–Stokes syndrome manifested by left-sided headaches, dizziness, and fainting. R. at 107. A January 1991 letter from Dr. Adams stated that he had been treating the veteran since October 1988 and that he believed the veteran's "black-out spells" that "he had been having for a number of years" prior to his heart attack "were Adams–Stokes [syndrome] due to inadequate cardiac output" and the "fact that coronary surgery improved [the veteran's] symptoms indicates [his] heart was the cause of the problem." R. at 109. (An October 1991 statement by Dr. Adams for state disability purposes stated that the symptoms of the veteran's disability of "heart disease, hypertension, arteriosclerosis" had first appeared in August 1988. R. at 162.)

The veteran submitted eight statements from co-workers, all dated August or September 1990, recounting that he had experienced episodes of dizziness or nausea during the years 1969 to 1988. R. at 117–25. He also submitted a 1969 private medical record which stated that his complaints of dizziness, left-sided headache, nausea, and vomiting "appear[ed] to be a variant of migraine." R. at 112. A 1977 private medical record noted a blood pressure reading of 132/80 and recorded complaints of "dizziness, and left sided headache at intervals for one year" that were diagnosed as due to postural hypotension and migraine. *Ibid.*

During a January 1991 RO hearing, the veteran testified under oath that he had suffered from dizzy spells before entering the service, but had never totally lost consciousness during those spells. R. at 128. He averred that in January 1967 he had lost consciousness for "three to five minutes" as he started to climb the steps to his truck after running for a mile in combat gear and that on January 8, 1968, he had lost consciousness as he was climbing a flight of stairs carrying a laundry bag and had been hospitalized overnight. R. at 130–31. He also testified that during service he had experienced shortness of breath on long marches and had taken an unusually long time to recover from them. R. at 136. The hearing officer denied service connection for dizzy spells on the grounds that no disability had been diagnosed in service, no residuals had been noted from the two in-service dizzy spells, and no abnormality had been noted on the separation medical examination, and that the veteran's current diagnosis was a cardiac disorder. R. at 140. A March 1991 RO decision denied service connection for a heart condition, blackout spells, dizziness, and osteoporosis. R. at 143. A written presentation to the BVA by the veteran's representative argued that "these [in-service] blackout spells were related to an inadequate cardiac output that was first manifested with these blackouts on active duty." R. at 148.

A February 1992 psychiatric evaluation recorded that the veteran "states that he has not worked for the period of time between Sept. 1988 to the current date" and concluded:

> [The veteran] demonstrates significant symptoms of anxiety as well as depression. He has become socially isolated, [and] is developing symptoms of claustrophobia[;]

he also startles very easily[;] anything that happens to him is interpreted as symptoms of another heart attack. He avoids work[-]type situations and is totally and completely unable to perform such, as he over compensates for anticipated pain with shortness of breath.

I see no positive chance for improvement in [the veteran's] condition in the foreseeable future. However, he is totally capable and competent to manage all personal financial affairs.

R. at 168, 170.

In August 1992, the Board remanded the claim to the RO to obtain an examination by a VA cardiologist on the issue whether any symptoms in service were the first manifestations of a heart disorder, and to readjudicate the issue of "service connection for coronary artery disease with hypertension, claimed as first manifested by dizziness and blackout spells in service". R. at 151–53. A September 1992 report by VA physician Dr. Spencer stated that the veteran was permanently and totally disabled and was "unable to work". R. at 208. A February 1993 letter from Dr. Adams stated that the veteran's "arteriosclerotic heart disease" had not improved, that he "continued to require [sic] to be totally disabled", and that the physician expected the veteran "to continue [to be] disabled in the future." R. at 165.

A May 1993 VA medical examination report stated that the "veteran was supposed to bring his [claims] file with him" but that the "C file is in Washington at the present time"; the diagnoses were heart disease, hypertension, and neurosis. R. at 180–81. An undated letter with "May 1993" written on it, addressed from the RO to a VA medical center, stated that the claims folder was being forwarded and "it is specifically requested that a Cardiologist review the entire record and take note of the paragraph noted in the claims folder from the [BVA] concerning the Cardiologist specifically rendering his opinion." R. at 196. A June 1993 VA cardiology examination did not indicate review of the claims file, noted the veteran's history of in-service blackout spells, described his 1988 heart attack, and stated the "Etiology" of his "cardiac diagnoses" as follows: "(1) Etiology:

Coronary atherosclerosis, essential hypertension." R. at 192.

The RO issued a Supplemental Statement of the Case (SSOC) in August 1993. R. at 200–02. In March 1994, a Board medical advisor (BMA), Dr. Rheingold, provided an opinion (BMAO) concluding that the veteran's heart attack was not related to his in-service episodes of lightheadedness, and that there was a "reasonable possibility" that brachycardia due to Adams–Stokes syndrome had caused the postattack brachycardia with arrhythmia which required a pacemaker. R. at 228. Dr. Rheingold noted Dr. Adams' conclusion that the veteran's in-service spells were due to Adams–Stokes syndrome, but stated: "[N]o data is available to prove any explanation for the lightheadedness[,] which could be due to a variety of causes." R. at 227. Dr. Rheingold's curriculum vitae indicates specialization in internal medicine and hematology. R. at 229. An April 1994 written presentation to the BVA by the veteran's representative noted that the case had been "returned to [the representative] for review of an opinion by [Dr.] Rheingold" and, citing *Thurber v. Brown*, 5 Vet.App. 119 (1993), asserted that "the veteran should be made aware of the evidence, provided information as to the reliance the Board proposes to place on the evidence, and given an adequate opportunity to respond". R. at 232.

In the July 1, 1994, BVA decision here on appeal, the Board denied entitlement to "service connection for a heart disease to include hypertension and arteriosclerosis with dizziness and blackout spells." R. at 4. The Board stated that the October 1989 RO decision had "granted non[-]service-connected pension benefits". R. at 5. After finding that the service-connection claim was well grounded, the Board determined that "all relevant facts have been properly developed" and that the "episodes of dizziness in service, and the sporadic symptoms after service, were unrelated to the postservice heart disease". R. at 6–7. The Board noted that service records showed no evidence of coronary artery disease or hypertension, and that Dr. Adams' statement that the in-service spells had been due to Adams–Stokes syn-

drome due to inadequate cardiac output were outweighed by Dr. Rheingold's statement and by the fact that Dr. Adams had indicated on a state disability form that the veteran's heart disease symptoms had first appeared in August 1988. R. at 8–9.

## II. Analysis

■ Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "[A] plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990); *see also Caluza v. Brown*, 7 Vet.App. 498, 506 (1995) (well-grounded claim requires medical diagnosis of current disability, medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury, and medical evidence of nexus between in-service injury or disease and current disability). The veteran has submitted medical evidence of a current heart disorder and Adams–Stokes syndrome. He has also presented a statement from Dr. Adams linking the current diagnosis of Adams–Stokes syndrome to the symptoms documented in the veteran's service records. The Court thus holds that the claim for service connection for a heart disorder was well grounded.

■ In *Thurber*, the Court held that, when the BVA relies on evidence obtained after the issuance of the most recent Statement of the Case (SOC) or SSOC, a claimant must be offered a reasonable opportunity to "respond" to that evidence. *Thurber*, 5 Vet. App. at 126. In *Austin v. Brown*, the Court expanded on *Thurber* and expressly held that the "response to which the claimant was entitled, as contemplated by *Thurber*, was not limited to argument or comment, but also included the claimant's right to submit additional evidence". *Austin*, 6 Vet.App. 547, 551 (1994). The Secretary (Motion (Mot.) for Remand at 2) and the appellant (Mot. to Remand at 14–15) are in agreement that a remand is required in this case because Dr. Rheingold's opinion was obtained after the issuance of the August 1993 SSOC and the veteran was not afforded an opportunity to submit additional evidence. *See Williams (Margie) v. Brown*, 8 Vet.App. 133, 138 (1995). The Court agrees and notes that the BVA's failure to follow *Thurber* is made all the more inexplicable in view of the veteran's representative having called to the Board's attention in April 1994 that *Thurber* compliance was lacking.

The appellant further argues that the BMAO should not be considered on remand and that the Court should require the BVA to obtain a comprehensive independent medical expert (IME) opinion from a cardiologist, addressing the medical and lay statements in the claims file, after taking into consideration the issues whether the veteran's in-service symptoms were early manifestations of Adams–Stokes syndrome or heart disease. Appellant's Reply to Appellee's Mot. to Remand at 3–4 (citing *Williams, supra*); *see also* 38 C.F.R. § 20.901(d) (1995) (providing for IME opinions when warranted in judgment of Board). In *Williams*, the Court stated:

The Secretary admitted that the BVA did not comply with 38 C.F.R. § 20.903 (1994) or with the express holding of *Austin*, in that it failed to give the veteran or her representative the opportunity to submit *evidence* in rebuttal to the BMAO. Therefore, the Secretary contends that the case should be remanded to the BVA for further development and readjudication. The Secretary represented to the Court that the RO on remand will provide for a "physical examination, and an opinion from an independent medical expert ..., *without consideration* of [the BMAO]", because the BMAO was obtained in apparent contravention [of] this Court's notice requirements set forth in *Austin*."

*Williams*, 8 Vet.App. at 137 (citation omitted).

In this case, as in *Williams*, the Secretary agrees that a remand is required under *Austin* to allow the veteran "to submit additional evidence in response to the Board's reliance

on the" BMAO. Mot. to Remand at 2. Therefore, as in *Williams,* the Court will vacate the BVA decision and remand the matter to the BVA for further development and readjudication consistent with this opinion. If any use of the BMAO is made on remand, "the BVA should answer the questions posed by this Court in *Austin.*" *Williams, supra.* First, the BVA must give an adequate statement of reasons or bases "for noncompliance with the notice requirements in 38 C.F.R. § 1.551(b) and (c)" (1995), or to explain why compliance was not necessary pursuant to 38 C.F.R. § 1.12 (1995). *Ibid.* Second, the Board must explain "why it requested the BMAO instead of remanding the case to the RO under 38 C.F.R. § 19.9" (1995), *ibid.,* and, as that regulation provides, "specifying the action to be undertaken". *Austin,* 6 Vet.App. at 553. Finally, "the Board must provide an adequate statement of reasons or bases as to how it has complied with [BVA] Memorandum" No. 01–94–17, of August 16, 1994, which provides that (1) BMAOs should no longer be used in individual appeals; (2) a BMAO which had been obtained but not yet transferred to a Board Section was to be removed from the record and destroyed; and (3) a BMAO already transferred to a Board Section was not to be used unless it was determined that such use did not prejudice the veteran. *Williams, supra.*

If, on remand, the Secretary makes no use of the BMAO, then further development of the case would be needed because the record would then be underdeveloped. *See West (Carleton) v. Brown,* 7 Vet.App. 70, 78 (1994) (inadequate record frustrates judicial review). Specifically, further development—a medical opinion—would be needed on the questions whether the heart condition is congenital, whether any preexisting condition was aggravated by service, and whether a relationship exists between the in-service symptoms and the current disability. The Board may seek to obtain that development itself through a VA Veterans Health Administration or non-VA IME opinion, *see* 38 U.S.C. §§ 5107(a), 7109; 38 C.F.R. § 20.901(a), (d) (1995), or through a remand to the RO for it to obtain an IME opinion, *see* 38 U.S.C. § 5109; 38 C.F.R. § 3.328

(1995), or to provide for a VA examination of the veteran, *see* 38 C.F.R. § 3.326(a) (1995). Any medical opinion obtained should be rendered by a cardiologist after review of all pertinent medical records regarding the veteran.

### III. Conclusion

On consideration of the foregoing, the record on appeal, and the briefs of the parties, the Court vacates the July 1, 1994, BVA decision and remands the matter for expeditious further development and readjudication, on the basis of all applicable law and regulation, *see Fletcher v. Derwinski,* 1 Vet. App. 394, 397 (1991), and issuance of a new decision supported by an adequate statement of reasons or bases—all consistent with this opinion and in compliance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (requiring Secretary to provide for "expeditious treatment" for claims "remanded" by BVA or the Court). *See Allday v. Brown,* 7 Vet.App. 517, 533–34 (1995). "On remand, the [claimant] will be free to submit additional evidence and argument" on the remanded claim. *Quarles v. Derwinski,* 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

VACATED AND REMANDED.