# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 02-2259

BARNEY O. PADGETT, APPELLANT,

V.

R. JAMES NICHOLSON,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided    April 19, 2005  )

*Barton F. Stichman* and *James W. Stewart* (non-attorney practitioner), both of Washington, D.C., were on the pleadings for the appellant.

*Tim S. McClain*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; *John D. McNamee*, Acting Deputy Assistant General Counsel; *Cristine D. Senseman*; and *Edward V. Cassidy, Jr.*, all of Washington, D.C., were on the pleadings for the appellee.

Before IVERS, *Chief Judge*, and STEINBERG, GREENE, KASOLD, and HAGEL, *Judges*.[*]

KASOLD, *Judge*, filed the opinion of the Court.  HAGEL, *Judge*, filed an opinion concurring in part and dissenting in part.  IVERS, *Chief Judge*, filed a dissenting opinion.

KASOLD, *Judge*:  World War II veteran Barney O. Padgett appeals through counsel an August 8, 2002, Board of Veterans' Appeals (Board) decision that denied his claim for VA disability compensation for service-connected osteoarthritis of the right hip on direct, presumptive, and secondary bases.  Record (R.) at 1-20.  In a July 9, 2004, panel decision of this Court issued after oral argument, the Board's decision was vacated and the matter remanded for readjudication.  On September 14, the Court granted motions by both parties for a full-Court decision and withdrew the panel decision.  *Padgett v. Principi*, 18 Vet.App. 404 (2004) (en banc order).  For the reasons stated

---

[*] Judges Moorman, Lance, Davis, and Schoelen, all of whom began regular active service on the Court after full-Court deliberations on this matter, did not participate in consideration of the appeal. *See* Court's Internal Operating Procedures at V(b)(1)(C).

below, the Board's decision will be reversed in part and set aside in part, and the matter will be remanded for further proceedings consistent with this opinion.

## I. FACTS

Mr. Padgett served on active duty in the U.S. Army from January 1943 to July 1945. He is a combat veteran who served in Europe, Africa, and the Middle East. R. at 22-23. In March 1943, he injured his left knee as a result of slipping on ice in Plattsburgh, New York. R. at 43. In July 1944, he reinjured his left knee during combat when he jumped into a ditch seeking cover from shell fire. R. at 54, 71. His service medical records indicate that he was diagnosed with having a sprained left knee, chronic, severe, and synovitis of the left knee, chronic, severe, secondary to the left-knee sprain. *Id.* In August 1945, a VA regional office (RO) awarded him service connection for residuals of a left-knee injury, rated at 30% disabling. R. at 92. That rating was reduced later to 10%. R. at 149.

In September 1975, Mr. Padgett filed claims seeking service connection for arthritis-related pain in his left leg, left hip, and the left side of his back. R. at 149. In a June 1976 decision, the RO assigned a 30% rating for traumatic arthritis of his left knee and for a residual sprain of the left knee with favorable ankylosis. R. at 185. The RO denied service connection for a lumbar-spine disorder and further determined that the evidence did not indicate the existence of a current left-hip disorder. R. at 185-87. Mr. Padgett appealed to the Board, claiming that all his arthritis had been caused by his service-connected left-knee injury. R. at 189-92, 201. In an April 1977 decision, the Board found that his multiple-joint arthritis, other than that of his left knee, was not incurred while in service, aggravated by service, or caused by an in-service disease or injury, and the Board denied his appeal. R. at 211-15.

In March 1993, Mr. Padgett filed a claim for service connection for a *right*-hip disorder on the basis that the need for a right-hip replacement was caused by his left-knee disability. R. at 218. The RO obtained treatment records from Dr. Charles H. Shaw, Mr. Padgett's private orthopedic surgeon. In those records, Dr. Shaw noted that in 1982 Mr. Padgett was "morbidly obese" and suffered from degenerative arthritis in the neck, spine, and knees. R. at 226. In 1988, Dr. Shaw wrote that x-rays taken after an October 1988 automobile accident depicted, inter alia, severe degenerative arthritis of the left knee with lesser changes in the right knee and severe degenerative

2

arthritis of the right hip with lesser changes in the left hip. R. at 230. Mr. Padgett underwent a right-total-hip arthroplasty in 1989. R. at 233-37. In 1991, Dr. Shaw also recommended a left-total-knee arthroplasty. R. at 237.

In May 1993, the RO found that there was no evidence that his right-hip condition had been caused by his left-knee disability and denied Mr. Padgett's claim. R. at 240, 242. Mr. Padgett appealed to the Board. R. at 246, 260. In support of his appeal, he submitted the following additional medical statements from his private physicians indicating that the degenerative disease that he was experiencing in his right hip was related to his left-knee injury. In a December 1993 letter, Dr. Shaw stated:

> Mr. Padgett historically sustained an injury to his left knee while in the [s]ervice. This injury has resulted in severe endstage traumatic osteoarthritis of his knee. He also states that he thinks he sustained an injury to his hip as a result of that same incident. Over the years he has developed progressively increasing degenerative disease of both his left knee and right hip.
>
> It is my feeling that the gait abnormalities associated with the severity of the disease involving his left knee ha[ve] adversely impacted the progression of the degenerative disease of his right hip and have in fact aggravated his symptoms with it. It is my feeling that the degenerative disease that he has experienced in his right hip is related to his original injury.

R. at 262.

In a January 1994 letter, Dr. Robert Thoburn, a private specialist in internal medicine and rheumatology, stated:

> [Mr. Padgett] had an injury to the left knee while in the service. This has progressed to severe osteoarthritis of the left knee secondary to trauma. He thinks he sustained an injury to the right hip and has progressive pain and stiffness of the right hip.
>
> He has an endstage left knee that has resulted in weight shifting to the right side. It is likely that this has resulted in progression of osteoarthritis of the right hip. It is consistent that the osteoarthritis of the right hip and left knee are related to the original injury.

R. at 261.

Mr. Padgett also submitted an October 1993 letter from Dr. James A. Rawls, in which Dr. Rawls stated that he had treated Mr. Padgett for almost 30 years and noted that "a major problem most of this time has been osteoarthritis involving the weight-bearing joints, knees, hips, and low back." R. at 263. Mr. Padgett also submitted a June 1979 letter from Dr. Rawls that noted Mr.

3

Padgett's left-knee pain, but Dr. Rawls did not comment specifically on Mr. Padgett's gait or right-hip disability.  R. at 265-67.  In March 1994, after reviewing this newly submitted evidence, the RO continued to deny the claim.  R. at 272-74.

In May 1994, Mr. Padgett filed a Notice of Disagreement with respect to the March 1994 RO decision and, in December 1994, he was afforded a hearing before the RO.  At the hearing, Mr. Padgett testified under oath that he had injured his right hip while in service at the same time that he had reinjured his left knee in 1944.  R. at 296-97.  In January 1995, after finding that the evidence did not provide a sufficient basis for service connection on either a direct or secondary basis, the RO again denied Mr. Padgett's claim R. at 303-04.

Mr. Padgett appealed that January 1995 RO decision to the Board (R. at 319) and submitted additional statements from Dr. Thoburn and Dr. Shaw (R. at 325, 340).  In a November 1995 letter, Dr. Thoburn opined: "It is my feeling that a shift in weight [because of his altered gait] plus his size and obesity contributed to accelerated osteoarthritis of his right hip," thereby leading to a total right-hip replacement.  R. at 325.  In an October 1996 statement, Dr. Shaw opined that Mr. Padgett's irregular gait pattern resulting from his left-knee injury increased symptoms in his right hip, which ultimately required right-hip replacement.  R. at 340.  Dr. Shaw concluded that "[Mr. Padgett's] war-related injury directly aggravated his symptoms with respect to his hip."  *Id.*

In April 1997, the Board remanded the case to the RO to (1) adjudicate Mr. Padgett's claim for compensation based on direct service connection, (2) reconsider his claim for compensation based on a secondary basis as a result of the Court's decision in *Allen v. Brown*, 7 Vet.App. 439 (1995) (en banc) (holding that veteran may be awarded compensation for aggravation of non-service-connected condition by service-connected disability), and (3) afford him a hearing before a traveling section of the Board.  R. at 354-57.

In June 1997, Mr. Padgett underwent a VA examination by Dr. F. Henderson.  R. at 360-63.  Dr. Henderson concluded that Mr. Padgett suffered from multijoint "degenerative joint disease" that was "a consequence of the aging process" rather than any one specific injury.  *Id.* at 363.  However, he also stated that Mr. Padgett's left-knee injury may have "played a part in the damage that later required a left-knee replacement, but not necessarily a hip replacement."  *Id.*  In addition, Dr. Henderson noted that he had not reviewed the claims file and that a certified orthopedist should review the case "for a more definitive opinion."  R. at 361, 363.

4

During a February 1999 Board hearing, Mr. Padgett again testified under oath that he had injured his right hip at the same time he had reinjured his left knee in 1944. R. at 393-410. In a July 1999 letter, the Board requested an expert medical opinion from the chief of staff of the Columbia, South Carolina, VA Medical Center (VAMC). R. at 413-15. As its authority for requesting the opinion, the Board's letter cites Veterans Health Administration Directive 10-95-040 (April 17, 1995), 38 C.F.R. § 20.901 (1999), and 38 U.S.C. § 7109. R. at 413. Dr. John K. Blincow, a VA employee, was tasked by the Chief of Staff of the VAMC to review Mr. Padgett's claims file and provide to the Board the requested advisory medical opinion. *See* R. at 413-20. After examining Mr. Padgett's claims file, Dr. Blincow concluded that (1) Mr. Padgett's right-hip disorder was caused by age-related degenerative arthritis and was not related to his in-service left-knee injury or a gait abnormality and (2) his left-knee disability did not aggravate or cause an increase in severity of his right-hip arthritis. R. at 418-20.

On August 8, 2002, the Board issued the decision on appeal. R. at 1-19. In its decision, the Board accorded the VA medical opinions more weight than the opinions rendered by Mr. Padgett's private physicians. R. at 14-18. The Board found that the opinions of the private physicians were "equivocal and apparently unsubstantiated [in] nature." R. at 16. In contrast, the Board stated that "both of [the VA opinions] have tremendous probative value as both were based on a thorough review of the claims file, which is essential [to] formulating a sound opinion." *Id.* The Board found that the medical evidence of record did not indicate a nexus between an in-service injury to Mr. Padgett's right hip and his current right-hip disability or that his right-hip disability manifested within one year after his discharge, and thus denied service connection on direct and presumptive bases. R. at 14-17. The Board also denied Mr. Padgett's claim for secondary service connection, after finding that Mr. Padgett's right-hip injury was not related to his service-connected left-knee disability. R. at 17-18.

On appeal, Mr. Padgett argues, inter alia, that (1) the Board erred in relying on the June 1997 VA medical opinion rendered by Dr. Henderson because he did not review Mr. Padgett's claims file, did not discuss the positive medical evidence in the claims file, and did not consider the fact that Mr. Padgett had injured his right hip in combat (Appellant's Brief (Br.) at 17-18); (2) the Board did not have the authority under the then-existing regulation, 38 C.F.R. § 20.901, to secure the 1999 VA expert medical opinion of Dr. Blincow, and even if the Board had the authority to obtain such an

5

opinion, under section 7104(a), title 38, U.S. Code, and *Disabled American Veterans v. Secretary of Veterans Affairs*, 327 F.3d 1339 (Fed. Cir. 2003) [hereinafter *DAV v. Sec'y*], the Board could not consider that opinion without first remanding the matter to the agency of original jurisdiction or obtaining Mr. Padgett's waiver (Appellant's Br. at 20-24); (3) the Board's finding that Mr. Padgett's right-hip condition is not related to an in-service injury or his service-connected left-knee disability is clearly erroneous because the private medical opinions of record provide the required etiological relationship for service connection to be awarded (Appellant's Br. at 15-16); and (4) because the Board could not properly rely on either of the VA medical opinions, the only medical opinions properly before the Board or the Court are those that support Mr. Padgett's claim and therefore the Court should reverse the Board's decision denying his claim (Appellant's Br. at 25). In the alternative, Mr. Padgett argues that the Court should remand the case for the Board to correct the errors that he identified and to ensure compliance with the notice and assistance requirements of sections 5103(a) and 5103A, title 38, U.S. Code. Appellant's Br. at 26 n.2.

The Secretary filed an initial brief in which he argued primarily for a remand, based on his failure to comply with notice duties under section 5103(a). Secretary's (Sec'y) Br. at 7-13. However, Mr. Padgett "waive[d] this Court's consideration [of] the errors relating to the . . . duty to notify discussed in . . . the Secretary's brief." Appellant's Reply Br. at 1-2. The Secretary, with leave of the Court, then filed a sur-reply brief in order to address Mr. Padgett's other arguments. Although the Secretary agrees with Mr. Padgett that the Board erred in relying on the 1997 VA medical opinion of Dr. Henderson (Sec'y Br. at 10), the Secretary argues that the Board had the authority under section 7109(a) and § 20.901 (2002) to obtain the 1999 VA medical opinion of Dr. Blincow, and that opinions obtained pursuant thereto do not require remand to the RO for initial consideration (Sec'y Sur-Reply Br. at 3-7).

In Mr. Padgett's response to the Secretary's sur-reply brief, he argues, inter alia, that Dr. Blincow's medical opinion did not fit under any exception to section 7104(a) that would allow the Board initially to consider additional evidence. Appellant's Response to Sec'y Sur-Reply Br. at 2-6. In his motion for a full-Court decision, the Secretary argues that section 7109(a) is a clear exception to section 7104(a) and that the United States Court of Appeals for the Federal Circuit (Federal Circuit) found in *DAV v. Sec'y* that the exception exists, thereby precluding this Court from holding otherwise. Sec'y Motion (Mot.) at 3. Mr. Padgett argues in his cross-motion for a full-Court

decision that the Court has full authority to review the Board's factual findings for clear error. Appellant's Mot. at 3.

## II. ANALYSIS

Mr. Padgett raises two issues concerning the Board's consideration of Dr. Blincow's 1999 expert medical opinion. First, he argues that the Board failed to follow applicable regulatory procedures in obtaining this medical opinion, thereby rendering its use invalid. Second, he argues that even if the Board had the statutory and regulatory authority to "secure" the opinion, it did not have the statutory authority to "consider" it in the first instance, absent a waiver from Mr. Padgett. We will address each of these contentions in turn.

### A. Regulatory Authority to Secure and Consider 1999 Expert Medical Opinion of Dr. Blincow

Before rendering its decision, the Board requested an expert medical opinion from the Chief of Staff of the VAMC in Columbia, South Carolina. Mr. Padgett argues that the Board lacked the authority under the law in effect at the time to ask the Chief of Staff to provide a medical opinion because the regulations provided only that such an opinion could be solicited from VA's Chief Medical Director (also known as the Under Secretary for Health), and made no reference to any other person, including a Chief of Staff of a VAMC. *See* Appellant's Br. at 20; *see also* 38 C.F.R. § 20.901(a).

After obtaining the expert medical opinion but during the pendency of the Board decision, the Secretary amended § 20.901(a) to authorize the Board to obtain a medical opinion from any appropriate health-care professional within VA, not just the Chief Medical Director. *See* Rules of Practice: Medical Opinions From the Veterans Health Administration, 66 Fed. Reg. 38,158, 38,159 (July 23, 2001); *compare* 38 C.F.R. § 20.901(a) (1999) *with* 38 C.F.R. § 20.901(a) (2002). Given this modification of the regulation, the Court cannot and does not find that Mr. Padgett was prejudiced by the Board's solicitation in 1999 of Dr. Blincow's expert medical opinion because the Board had clear regulatory authority to take such action and consider Dr. Blincow's opinion in 2002, when it ultimately relied upon it and rendered the decision here on appeal. *See* 38 U.S.C. § 7261(b)(2) (Court shall take due account of rule of prejudicial error).

7

***B. Statutory Authority to Secure and Consider***
***Expert Medical Opinion***

Mr. Padgett also argues that, even if obtaining or securing Dr. Blincow's opinion was permissible by regulation, the Board could not rely upon Dr. Blincow's medical opinion in the first instance, absent the claimant's waiver, because it would deny Mr. Padgett his right to "one review on appeal to the Secretary" as provided for by 38 U.S.C. § 7104(a); *see also DAV v. Sec'y*, *supra*. Although Mr. Padgett focuses on the Board's authority – or lack thereof – to "consider" Dr. Blincow's opinion in the first instance, it is essential that we first examine the statutory authority of the Board to "secure" the opinion. For the reasons set forth below, we conclude that in section 7109(a) the United States Congress statutorily recognized and sanctioned the practice of the Board to secure expert medical opinions from VA employees and thereby provided statutory authority for that practice. We also find that the authority of the Board to secure a medical opinion includes the authority for the Board to consider that opinion.

*1. Board May Secure Expert Medical Opinions*

At the outset, we note that the Court already has addressed on several occasions the Board's use of medical opinions it obtained, and concluded, either directly or implicitly, that the Board had the authority to secure medical expert opinions from both VA and non-VA employees. *See, e.g.*, *Winsett v. West*, 11 Vet.App. 420, 426 (1998) (holding that section 7109(a) does not preclude Board from obtaining medical opinions not rendered from outside VA); *Perry v. Brown*, 9 Vet.App. 2, 6 (1996) (stating that, in event that medical-nexus opinion was needed on remand, "Board may seek to obtain that development itself through a [VA] or non-VA [medical expert] opinion"); *Thurber v. Brown*, 5 Vet.App. 119, 120-21 (1993) (commenting that section 7109 assumes, although does not specifically authorize, Board's obtaining opinions of VA medical experts, and holding that 38 C.F.R. § 20.901(a) authorizing such action is a valid promulgation pursuant to statutory sections 7109 and 5107(a)); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984) (Court gives deference to executive department's regulation making reasonable interpretation of statutory scheme). In light of the subsequent issuance of the Federal Circuit's opinion in *DAV v. Sec'y*, however, we feel constrained to examine this question anew and thus proceed to do so.

In *DAV v. Sec'y*, the Federal Circuit held that a regulation authorizing the Board to obtain additional evidence without remand to an RO for initial consideration of that evidence violated the

statutory requirement in section 7104(a) that there be one appellate review of the Secretary's decisions. *See DAV v. Sec'y*, 327 F.3d at 1353 (invalidating 38 C.F.R. § 19.9(a)(2) (2000)). Although the Federal Circuit concluded that section 7104(a) generally precluded the Board from considering new evidence in the first instance, absent waiver by the claimant, that court recognized that Congress could make exceptions, and further noted that Congress had explicitly done so with regard to expert medical opinions in at least two statutory provisions as implemented by regulation. Specifically, the Federal Circuit stated:

> [W]hen Congress intended to authorize the Board to obtain additional evidence without "one review on appeal to the Secretary," it knew how to do so. Congress has provided express statutory authority to permit the Board to obtain additional evidence, such as expert medical opinions in specific cases. *See, e.g.*, 38 U.S.C. § 5107(a) (2000) (authorizing Board to obtain medical opinions from VA's Under Secretary for Health (formerly the Chief Medical Director)); 38 U.S.C. § 7109 (2000) (authorizing Board to obtain independent medical opinions from outside the VA); 38 C.F.R. § 20.901(a) (2002) (authorizing Board to obtain opinions from the Veterans Health Administration); 38 C.F.R. § 20.901(b) (authorizing Board to obtain medical opinions from the Armed Forces Institute of Pathology).

*DAV v. Sec'y*, 327 F.3d at 1347-48. Although we note that former section 5107(a) (now 38 U.S.C. § 5103A(d)) did not expressly authorize the Board to obtain or secure medical opinions, the import of the Federal Circuit's analysis, at least as it relates to this case, is that court's recognition that Congress may provide an exception to the one-appellate-review requirement of section 7104(a), and that Congress did so in section 7109. We agree.

"The starting point in interpreting a statute is its language, for 'if the intent of Congress is clear, that is the end of the matter.'" *Gardner v. Brown*, 5 F.3d 1456, 1456 (Fed. Cir. 1993) [hereinafter *Gardner II*], *aff'd*, 513 U.S. 115 (1994). "Determining a statute's plain meaning requires examining the specific language at issue and the overall structure of the statute." *Gardner v. Derwinski*, 1 Vet.App. 584, 586 (1991) [hereinafter *Gardner I*], *aff'd sub nom. Gardner II*, 5 F.3d 1456 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994); *see also Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000) ("canons of construction . . . require us to give effect to the clear language of a statute and avoid rendering any portions meaningless or superfluous"); *Gardner I*, 1 Vet.App. at 587-88 ("Where a statute's language is plain, and its meaning clear, no room exists for construction. There is nothing to construe."). Where the plain meaning of a statute is discernible, that "plain meaning must be given effect unless a 'literal application of [the] statute will produce a result

demonstrably at odds with the intention of its drafters.'" *Gardner I*, 1 Vet.App. at 587 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

Section 7109(a) authorizes the Board to secure expert medical opinions when deemed necessary. Although this section authorizes the Board to secure these opinions from experts who are not employees of VA, it also recognizes and sanctions the Board's practice to secure such opinions from medical experts employed by VA. Section 7109(a) states in relevant part:

> When, in the judgment of the Board, expert medical opinion, ***in addition to that available within the Department [of Veterans Affairs]***, is warranted by the medical complexity or controversy involved in an appeal case, the Board may secure an advisory medial opinion from one or more independent medical experts who are not employees of the Department.

38 U.S.C. § 7109(a) (emphasis added).

Although section 7109(a) does not explicitly authorize the Board to secure expert medical opinions from experts within VA, the phrase "***in addition to that available within the Department [of Veterans Affairs]***" is an express sanctioning of the practice of the Board to use such experts. The inclusion of this reference to the Board's existing practice within the statutory authority for the Board to use experts outside VA, creates a strong implication that Congress was recognizing and approving the existing practice of the Board to secure medical opinions from experts within VA.

Moreover, to the extent that there is any doubt, the legislative history of section 7109(a) demonstrates that this recognition of the Board's practice of using VA medical experts in addition to outside medical experts was a deliberate action by Congress. *See Steadman v. SEC*, 450 U.S. 91, 101 (1981) (Court may look to legislative history to reveal Congress' intent). The principal purpose of the section that eventually became section 7109 was to provide the Board with the authority to secure an advisory medical opinion from independent medical experts who were not employees of VA. *See* Pub. L. No. 87-671, 76 Stat. 557 (1962); 38 U.S.C. § 4009 (1962) (redesignated as section 7109 by Pub. L. No. 12-40, § 402(b)(1), 105 Stat. 238 (1991)). The House-passed version of the bill would have ***required*** the VA chief medical director to "render an opinion to the Board on the medical aspects of the case" in every case in which (1) an RO had denied a service-connection claim, (2) medical evidence had been submitted that tended to support the claim, and (3) the case was appealed and such an opinion was requested. In such cases, the opinion would have to "be considered by the Board." H.R. REP. NO. 87-1453, at 2 (1962) (to accompany H.R. 852); *see also*

H.R. 852, 87th Cong. (2d Sess.), § 1 (adding new section 4009 to title 38, U.S. Code) (as reported Mar. 19, 1962); 108 CONG. REC. 5519 (Apr. 2, 1962) (House passage of reported bill). In addition, after a claim had been disallowed, reopened, and again denied, the House-passed bill also would have required the Chief Medical Director, upon request after appeal to the Board, to refer the case to an independent medical-expert advisory panel for review, and it would have made the opinion of that panel "binding upon the Board." *Id.*

The United States Senate committee considering the bill amended it by dropping the mandate to the Chief Medical Director and the Board, thereby leaving "the use of independent medical experts permissive with the Board rather than mandatory as would have been required by the bill as passed by the House of Representatives." S. REP. NO. 87-1844 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2585, 2586. It explained its action by noting that the bill it was reporting made "no reference to the Board of Veterans' Appeals securing an advisory opinion from the Chief Medical Director of the Veterans' Administration *since this is a matter within Agency discretion and ample authority for this practice now exists*." *Id.* (emphasis added); *see* H.R. 852, 87th Cong. (2d Sess.), § 1 (amending proposed section 4009 in House-passed bill) (reported Aug. 6, 1962). The Senate version of the bill authorizing the Board to seek expert medical opinions "in addition to that available within the Department," was concurred in by the United States House of Representatives, 108 Cong. Rec. 18406 (Sept. 4, 1962), and thereafter was enacted. By adding this language, instead of the House mandatory language, Congress recognized and approved the continuing authority of the Board to seek expert medical opinions from medical experts employed by VA in addition to the newly granted authority to secure such opinions from medical experts outside VA. This recognition is demonstrated by the Explanatory Statement on Compromise Agreement on Division A, accompanying the enactment of the Veterans Judicial Review Act, Pub. L. 100-687, § 103(a)(1), 102 Stat. 4105 (1988), which, inter alia, modified then-section 4009 and stated that "[t]he Committees . . . note with approval the current practice of obtaining [expert medical] opinions" from within VA. 134 Cong. Rec. S16653 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5834, 5842. Thus, we hold that section 7109 provides statutory authority for the Board to secure medical opinions from both VA and other medical experts.

We now address Mr. Padgett's argument that the plain wording of section 7109(a) authorizes the Board only to secure, not to consider in the first instance, an expert medical opinion, and that

11

this means that the Board is required to return a case to the RO for initial consideration of any expert medical opinion that the Board might secure.  For the reasons stated below, we reject this interpretation.

### 2. Board Initially May Consider Expert Medical Opinions It Secures

Although Mr. Padgett correctly notes that section 7109(a) authorizes the Board to "secure" expert medical opinions and does not explicitly state that the Board may "consider" those opinions in the first instance, his interpretation of the statute to mean that the Board is precluded from so considering them is inconsistent with the analysis of *DAV v. Sec'y*, *supra*, as well as the discussion in *Perry* and *Thurber*, *both supra*.  Mr. Padgett's interpretation is also inconsistent with the statutory scheme and the legislative purpose behind section 7109 and it would produce absurd results.

*a. DAV v. Sec'y*, *Perry*, and *Thurber*:  In *DAV v. Sec'y*, the Federal Circuit stated:  "[W]hen Congress intended to authorize the Board to obtain additional evidence without 'one review on appeal to the Secretary,' it knew how to do so."  327 F.3d at 1347-48.  If the Federal Circuit was addressing only the obtaining (or securing) of evidence in its narrowest sense, as Mr. Padgett would have us construe those terms, then there would have been no need for the Federal Circuit to note that Congress knew how to authorize the Board to obtain such evidence "without 'one review on appeal to the Secretary'" because the mere obtaining of evidence by the Board (without review) could not violate the one-appellate-review requirement of section 7104(a); only the Board's consideration of such evidence could possibly do so.  We view the Federal Circuit's conclusion in this respect as integral to its analysis of section 7104(a) and therefore not dictum.  *See generally Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1307-08 (Fed. Cir. 2004) (defining dictum as language that is unnecessary to decision in case) (citing BLACK'S LAW DICTIONARY 1100 (7th ed. 1999)); *see also DaimlerChrysler Corp. v. United States*, 361 F.3d 1378, 1385 n.3 (Fed. Cir. 2004) (noting that, even if dictum, court "would feel obligated to follow the Supreme Court's explicit and carefully considered statements"); *Ins. Co. of the West v. United States*, 243 F.3d 1367, 1372 (Fed. Cir. 2001) (same); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1349-50 (Fed. Cir. 2000) (same).  Moreover, consistent with *DAV v. Sec'y*, this Court has implicitly recognized the propriety of the Board's consideration of medical opinions it obtains.  *See Perry*, 9 Vet.App. at 6 (stating that on remand the Board could develop a case itself through use of a VA medical expert opinion); *Thurber*,

12

5 Vet.App. at 126, (noting that notice to a claimant and opportunity to respond were required before Board could rely on a VA medical expert opinion that it obtained).

Even if the language in *DAV v. Sec'y* was not binding upon us, based on the following analysis we agree with the Federal Circuit's conclusion as to section 7109.

*b. Statutory Scheme*: Although the plain language of the statute – here authorizing the Board to "secure" an expert medical opinion from both VA and non-VA medical experts – is the starting point of an analysis of that statute, *see Gardner II, Splane*, and *Gardner I*, all *supra*, it is not the totality of analysis. When interpreting the meaning of a statute, "each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole" and "it is not proper to confine interpretation to the one section to be construed." 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 46:05 (6th ed. 2000) [hereinafter SUTHERLAND]. That is, "the court will not only consider the particular statute in question, but also the entire legislative scheme of which it is a part." SUTHERLAND, § 46:05; *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (when interpreting statute, court is required to look at context and provisions of law as a whole); *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) (all parts of a statute must be construed together without according undue importance to single or isolated portion). Moreover, a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." SUTHERLAND, § 46:06; *see also Splane*, *supra*.

The statutory scheme pertinent to our review in this case includes separate authorities for the Secretary to obtain medical opinions at the RO level. *See* 38 U.S.C. §§ 5103A(d), 5109. Those medical opinions are first considered by an RO, whose decisions can be appealed to the Board. *See* 38 U.S.C. §§ 7104(a), 7105. Section 7109(a) gives the Board separate and independent authority to secure advisory medical opinions when, "in the judgment of the Board, expert medical opinion, in addition to that available within the Department, is warranted by the medical complexity or controversy involved in an appeal case". 38 U.S.C. § 7109(a). Considering these provisions in concert, the Court concludes that it would have been incongruous for Congress to have given discretionary authority to the Board to obtain a medical opinion but require initial review of that opinion by the RO, which already had an opportunity to seek and review medical opinions obtained

under its own separate authority in 38 U.S.C. § 5109. Unlike *DAV v. Sec'y*, this is not a case involving regulatory authority for the Board to consider evidence that conflicts with a statutory right to one review on appeal. Rather, the authority issue here involves the statutory scheme itself. Requiring the Board to send information that it is statutorily permitted to secure back to the RO for initial consideration is inconsistent with the overall statutory scheme and the intent of Congress (described below in part II.B.1.c) that the Board resolve conflicts in evidence.

Our conclusion that Congress intended for the Board to consider the expert opinions that it obtained under section 7109(a) is further supported by the fact that Congress also provided due-process protections. Subsection (c) of section 7109 requires the Board to furnish notice and a copy of the opinion to the claimant. *See Winsett*, 11 Vet.App. at 426 ("subsection (c) of section 7109[, by] requir[ing] notice and provision of a copy of the [VA] opinion to a claimant (as does section 5109[(c)]), merely restates the procedural process due a claimant under higher law before a decision is made"); 38 C.F.R. § 20.903(a) (2004) (Board to give claimant notice and opportunity to respond to evidence obtained under § 20.901, the regulation implementing section 7109(a)); *see also Thurber*, 5 Vet.App. at 122 (concluding that 38 C.F.R. § 20.903, which requires notification to claimant of use by Board of expert medical opinion and opportunity to respond, "applies to both independent and VA opinions"). If an expert opinion obtained by the Board had to be sent to the RO before it could be considered by the Board, there would be no need for the Board to provide notice and a copy to the claimant because the RO is otherwise required to do so. *See* 38 U.S.C. § 5109(c); 38 C.F.R. § 3.328(d) (2004).

*c. Legislative Purpose*: The express purpose for enacting the provision that is now codified as section 7109 was "to improve the appellate procedures applicable to veterans' claims by authorizing the referral of such claims to independent medical experts" in order to "resolve conflicts of evidence in questions involving service connection of disabilities or deaths." S. REP. NO. 1844 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2585, 2585-86. The interpretation of the scheme urged by Mr. Padgett, i.e., remanding to the RO for initial consideration of expert medical opinions requested and obtained by the Board pursuant to section 7109(a), does nothing to improve the referenced appellate procedures. We believe that it is difficult, if not impossible, to escape the conclusion that Congress, by specifically referencing appellate procedures and by vesting in the Board (VA's

14

appellate body) the authority to procure such expert medical opinions, intended that the Board be able both to procure and to review the medical opinions obtained under section 7109(a).

d. *Avoiding Absurd Results*: Finally, Mr. Padgett's interpretation of section 7109(a) would lead to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994) ("Some applications of respondent's position would produce results that were not merely odd, but positively absurd . . . . We do not assume that Congress, in passing laws, intended such results."); *Timex V.I., Inc. v. United States*, 157 F.3d 879, 886 (Fed. Cir. 1998) ("statutory construction that causes absurd results is to be avoided if at all possible"). It would be absurd to conclude that Congress authorized the Board to "secure" but not "consider" VA expert medical opinions, when the Board was already authorized to remand matters to the RO for consideration, and the RO was authorized to obtain and consider VA expert medical opinions. *See* 38 U.S.C. §§ 5103A(d), 5109. The incongruity of a conclusion that the Board is authorized to obtain, but not consider in the first instance, an expert medical opinion is further illustrated by the application of that conclusion to another section of the statutory scheme, section 7107, title 38, U.S. Code. Under section 7107, if Mr. Padgett's position that the Board can do only what is explicitly authorized is correct, then the Board could hold a hearing and record Mr. Padgett's testimony but, because section 7107 fails to state explicitly that the Board can consider his testimony in the first instance, the hearing transcript would have to be sent to the RO for initial consideration (where Mr. Padgett may already have had a hearing, *see*, *e.g.*, 38 U.S.C. § 7105(a) (stating that, after the filing of a Notice of Disagreement, "[e]ach appellant will be accorded hearing . . . rights"); 38 C.F.R. §§ 3.103(a) (requiring notice of right to hearing and citing 38 U.S.C. § 501(a) as statutory authority for this right); 3.105(i) (affording claimant opportunity for hearing prior to severance of service connection, reduction in compensation or pension, and other reductions and discontinuances) (2004)). This would mean that the Board could no longer assess in the first instance the credibility of the hearing testimony of a claimant, a well-recognized role of the Board. *See Cuevas v. Principi*, 3 Vet.App. 542, 547 (1992) (noting that Board is required to "address the credibility of appellant's sworn testimony or provide reasons for discounting that testimony"); *Wilson v. Derwinski*, 2 Vet.App. 16, 20 (1991) (same); *Smith v. Derwinski*, 1 Vet.App. 235, 237-38 (1991) ("[d]etermination of credibility is a function for the [Board]"). Because Mr. Padgett's interpretation would lead to the above absurd results, it should be avoided.

### 3. *Summary*

In summary, we conclude that section 7109(a) gives the Board the authority to secure expert medical opinions from both VA and non-VA medical experts, and that such authority includes the authority to consider in the first instance the information so obtained and does not conflict with the section 7104(a) right to one appellate review, particularly given the fact that due-process protections are provided in the statute and regulation, 38 U.S.C. § 7109(a); 38 C.F.R. § 20.903(a). This conclusion, in effect, reaffirms *Thurber*, *supra*, and is consistent with *DAV v. Sec'y*, *supra*. Accordingly, the Court holds that the Board's consideration of Dr. Blincow's expert medical opinion was fully consistent with the statutory scheme as an exception to, and not in conflict with, the "one review on appeal to the Secretary" provision of section 7104(a).

## III. REMEDY

Mr. Padgett seeks reversal of the Board decision based on his argument that the Board could not properly rely on either VA medical opinion, leaving the opinions of Drs. Shaw and Thoburn as the only medical opinions properly before the Board. Although the Court rejects the contention that the Board could not consider the VA medical opinions for any purpose, we nevertheless find reversal appropriate as to the denial of Mr. Padgett's secondary-service-connected right-hip-disability claim. Additionally, remand is appropriate with regard to his claims for presumptive and direct service connection for his right-hip disability.

### A. Board Decision as to Secondary Service Connection for Right-Hip Disability will be Reversed

Secondary service connection may be granted for any disability that is proximately due to or the result of a service-connected disease or injury. 38 C.F.R. § 3.310(a) (2004); *see Allen*, 7 Vet.App. at 448 (allowing secondary service connection for aggravation of non-service-connected condition by service-connected disability). The Board's decision regarding the finding of secondary service connection is a finding of fact that the Court reviews under the "clearly erroneous" standard of review set forth in 38 U.S.C. § 7261(a)(4). *See Harder v. Brown*, 5 Vet.App. 183, 187 (1993). In this regard, section 7261(a)(4) directs the Court to "reverse or set aside" any "finding of material fact adverse to the claimant . . . if the finding is clearly erroneous." 38 U.S.C. 7261(a)(4). "'A finding is 'clearly erroneous' when *although there is evidence to support it,* the reviewing court on

16

the entire evidence is *left with the definite and firm conviction that a mistake has been committed*.'" *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) (emphasis added) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Of course, if the Board's "'account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it.'" *Gilbert*, 1 Vet.App. at 52 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

Additionally, when assessing the factual determinations of the Board, the Court is required by 38 U.S.C. § 7261(b)(1) to "take due account" of the application of 38 U.S.C. § 5107(b), the "benefit-of-the-doubt" rule in every case. Under this rule, the Secretary is charged with the duty to consider all information and evidence of record and, when there is an "approximate balance of positive and negative evidence regarding any issue material to the determination of the matter, the Secretary shall give the benefit of the doubt to the claimant." 38 U.S.C. § 5107(b); *see also Mariano v. Principi*, 17 Vet.App. 305, 313 (2003) (also referring inferentially to benefit-of-the-doubt rule as "equipoise standard"); 38 C.F.R. § 3.102 (2004). Put another way, under the benefit-of-the-doubt rule, "the preponderance of the evidence must be against the claim for benefits to be denied." *Gilbert*, 1 Vet.App. at 54; *see Robinette v. Brown*, 8 Vet.App. 69, 76 (1995) ("the unique evidentiary burdens in the VA adjudication system . . . permit a merits disallowance only where the evidence preponderates against the claim"); *see also Ortiz v. Principi*, 274 F.3d 1361, 1365 (Fed. Cir. 2001) ("benefit of the doubt rule may be viewed as shifting the 'risk of nonpersuasion' onto the VA to prove that the veteran is not entitled to benefits"). In application, this rule creates a preponderance-against-the-claim evidentiary standard that applies to every finding of material fact. *See Mariano*, *Robinette*, and *Gilbert*, all *supra*. The Court cannot carry out its section 7261(b) responsibility to "review the record of proceedings before the Secretary and the Board . . . and . . . take due account of the Secretary's application of section 5107(b)", 38 U.S.C. § 7261(b), (b)(1), without referring to the probativeness of the evidence that the Board weighed in finding that the evidence preponderated against the claim. Indeed, that is exactly what the Court did three times in its opinion in *Mariano*, 17 Vet.App. at 313-17.

Although in *Gilbert* the Court indicated that a review of the Board's application of the benefit-of-the-doubt rule would be under the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of review pursuant to 38 U.S.C. § 7261(a)(3)(A),

17

*Gilbert*, 1 Vet.App. at 58 (dictum), such a review was not carried out there because the Court concluded that the Board's statement of reasons or bases was inadequate, thereby warranting remand, *id.* at 59. More recently, the Court held that it reviews the "outcome" of the Board's application of the benefit-of-the-doubt rule under the "clearly erroneous" standard of review set forth in 38 U.S.C. § 7261(a)(4), and then proceeded to apply that standard of review. *Mariano*, *supra* (quoting *Roberson v. Principi*, 17 Vet.App. 135, 146 (2003)). Accordingly, if the Court has "'the definite and firm conviction that a mistake has been committed'" by the Board in finding that the evidence preponderated against the claim on a finding of material fact, then section 7261(a)(4) and section 7261(b)(1) require that such finding be held clearly erroneous and be reversed or set aside. *Gilbert*, *supra* (quoting *U.S. Gypsum Co.*, *supra* (reversing lower Court's finding of fact under "clearly erroneous" standard of review)); *see also* Veterans Benefits Act of 2002 (VBA), Pub. L. No. 107-330, § 401, 116 Stat. 2820, 2832 (enacting section 7261(b)(1) and revising section 7261(a)(4)); *Mariano*, *supra* (noting "clearly erroneous" standard of review applies to assessment of "outcome of the Board's application" of benefit-of-doubt rule, thrice holding Board's application of section 5107(b) clearly erroneous, and twice reversing it and once setting it aside); *Roberson*, 17 Vet.App. at 147 (noting no change to "clearly erroneous" standard of review). *But see Wells v. Principi*, 18 Vet.App. 33, 39 (2004) (en banc order) (Steinberg, J., dissenting to denial of full-Court decision) (opining that VBA brought "about a major expansion of the Court's responsibilities as to review of BVA factfinding").

The Secretary argues that the Court cannot hold clearly erroneous a Board finding unless the evidence is uncontroverted against the Board's finding; specifically, the Secretary states:

> Reversal by the Court is warranted only when there is absolutely no plausible basis for the [Board's] decision and where the [Board's] decision is clearly erroneous in light of the uncontroverted evidence in [the a]ppellant's favor. *Hicks v. Brown*, 8 Vet.App. 417, 422 (1995). The medical evidence regarding nexus or aggravation in this case is controverted, so reversal is not appropriate.

Sec'y Sur-Reply at 3. The *Hicks* language cited by the Secretary as authority for not finding clear error unless the evidence is uncontroverted was derived from *Hersey v. Derwinski*, 2 Vet.App. 91, 95 (1992), where it was used to describe how strong the claimant's evidence was – it was "uncontroverted". This characterization of the evidence in *Hersey* was not presented as a new or different criterion for "clearly erroneous" review. *See Hicks*, *supra*; *see also Wells v. Principi*,

18 Vet.App. 33, 47-48 (en banc order) (Steinberg, J., dissenting to denial of full-Court decision) (analyzing *Hicks* and *Hersey* in relation to *Anderson*, *U.S. Gypsum Co.*, and *Gilbert*); *id* at 49-51 (Kasold, J., dissenting to denial of full-Court decision) (same).

It is clear from *U.S. Gypsum Co.*, *Mariano*, and *Gilbert* that the existence of some controverting evidence (that is, evidence that is not in the appellant's favor) does not preclude this Court from carrying out the mandates in section 7261(a)(4) and (b)(1) to "review the record of proceedings before the Secretary and the Board" and then to "take due account of the Secretary's application of [the] section 5107(b)" benefit-of-the-doubt rule (i.e., "the preponderance of the evidence must be against the claim for benefits to be denied," *Gilbert*, *supra*), 38 U.S.C. § 7261(b)(1), that governs the Board's decisionmaking as to every finding of material fact, and to "set aside or reverse" that application when it is "clearly erroneous," 38 U.S.C. § 7261(a)(4). *See Mariano*, 17 Vet.App. at 313-17 (twice holding Board's findings clearly erroneous even though evidence was not uncontroverted); *see also U.S. Gypsum Co.*, 333 U.S. at 395-96 (finding lower court's finding clearly erroneous where evidence was not uncontroverted). To the extent that *Hicks* and other precedent relying on *Hersey* can be read to support the proposition that a Board finding cannot be clearly erroneous unless the evidence against that finding is uncontroverted, that precedent is overruled unanimously.

In reviewing the Board's decision to deny secondary service connection for the right-hip disability in light of the entire record in this case, we note that there are two doctors with intimate knowledge of Mr. Padgett and his medical status who opine that his left-knee injury "directly aggravated," "adversely impacted," or otherwise "contributed to" or "resulted in" his right-hip problems. R. at 261-62, 325, 340. Dr. Thoburn, a rheumatologist, was aware of Mr. Padgett's knee condition since at least 1975, when Dr. Thoburn was consulted by another doctor who believed that Mr. Padgett had severe degenerative arthritis and a possible torn medial meniscus of the left knee. R. at 162. In 1976, Dr. Thoburn treated Mr. Padgett for, inter alia, degenerative arthritis of the left knee. R. at 189-91. Dr. Shaw, an orthopaedic surgeon, began treating Mr. Padgett in 1982, performed his right-total-hip arthroplasty in 1989, and evaluated his medical condition in follow-up medical evaluations through 1991. R. at 226-37. Dr. Shaw provided copies of his periodic evaluations to Dr. Thoburn throughout his treatment of Mr. Padgett. R. at 226-37.

19

The Board noted Dr. Shaw's opinion that Mr. Padgett's "in service left knee injury resulted in severe traumatic osteoarthritis of the left knee which adversely impacted the progression of degenerative disease of the right hip and aggravated his symptoms" and that his "in service left knee injury resulted in an irregular gait pattern which directly aggravated his right hip symptoms." R. at 17. Further, the Board noted Dr. Thoburn's opinion that Mr. Padgett's "left knee condition resulted in his weight shifting to the right side, which resulted in the progression of osteoarthritis of the right hip." *Id.*

In contrast to the opinions of Drs. Shaw and Thoburn, which are based on personal examinations and knowledge of Mr. Padgett's pertinent medical and physical history, including direct observation of the alteration of his gait, are the opinions of Drs. Henderson and Blincow, the VA doctors. Dr. Henderson examined Mr. Padgett but, contrary to what the Board stated in its decision, he did not review the claims file. R. at 16, 361 (Dr. Henderson's report stating, "C file was not available for review"). Dr. Henderson's report also made no mention of Mr. Padgett's in-service right-hip injury. R. at 360-63. These factors render Dr. Henderson's report of "questionable probative value." *Mariano*, 17 Vet.App. at 317 (flawed methodology in creating medical report renders report of "questionable probative value"); *Bielby v. Brown*, 7 Vet.App. 260, 268 (1994) ("In order for an expert's opinion to be based upon the facts or data of a case, those facts or data must be disclosed to or perceived by the expert *prior to* rendering an opinion[;] otherwise the opinion is merely conjecture and of no assistance to the trier of fact.") (emphasis in original); *Green v. Derwinski*, 1 Vet.App. 121, 124 (1991) (duty to assist requires providing claimant with "thorough and contemporaneous" medical examination that "takes into account the records of prior medical treatment"); 38 C.F.R. § 4.1 (2004) ("It is . . . essential both in the examination and in the evaluation of a disability, that each disability be viewed in relation to its history.").

Moreover, Dr. Henderson's diagnosis was not definitive, stating that the "fact that both hips and knees are affected by this problem [(i.e., degenerative joint disease)] *suggest[s]* that it is a consequence of the aging process," further stating that the "fact that he did injure the left knee . . . 50 years ago *suggest[s]* that this may have played a part in the damage that required a knee replacement, but not necessarily a hip replacement," and further noting that "[f]or a more definitive opinion, it is suggested that a certified orthopedist review this case." R. at 363 (emphasis added). The latter statement diminishes further the value of this report as probative medical evidence. *See*

20

*Espiritu v. Derwinski*, 2 Vet.App. 492, 494-95 (1992) (question involving special knowledge requires witness skilled in that area); *see also Sklar v. Brown*, 5 Vet.App. 140, 146 (1993) (specialist's opinion on medical matter outside his or her specialty to be given little weight); *Guerrieri v. Brown*, 4 Vet.App. 467, 470-71 (1993) ("probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the physician's knowledge and skill in analyzing the data, and the medical conclusion that the physician reaches"); *cf. Bloom v. West*, 12 Vet.App. 185, 187 (1999) (speculative medical opinion cannot establish in-service medical nexus to service).

Dr. Blincow's report fares not much better. Although direct examination of Mr. Padgett by a medical expert is not necessary to make the expert's medical report competent, *see Black v. Brown*, 10 Vet.App. 279, 286 (1997) (Kramer, J., dissenting) ("medical opinions obtained from . . . medical experts provide sufficient bases for awarding a claim . . . and those physicians, by definition, examine only records, not patients" (citing 38 C.F.R. § 20.901(a), (d)), the lack of a complete and accurate record, at least as to material and relevant facts, certainly undercuts an expert medical opinion's probative value. *See Bielby*, *supra*.

Dr. Blincow makes no reference to the in-service incurrence of Mr. Padgett's combat-related right-hip injury, which the Board accepted as having occurred as Mr. Padgett had asserted. R. at 16; *see* 38 U.S.C. § 1154(b); 38 C.F.R. § 3.304(d) (2004) ("[s]atisfactory lay or other evidence that an injury or disease was incurred or aggravated in combat will be accepted as sufficient proof of service connection if the evidence is consistent with the circumstances, conditions or hardships of such service"); *cf. Caluza v. Brown*, 7 Vet.App. 498, 508 (1994) (lay evidence of veteran's combat-related injury must be accepted by Board as sufficient proof of in-service incurrence or aggravation of injury absent clear and convincing proof to contrary), *aff'd*, 78 F.3d 604 (Fed. Cir. 1996) (table). Indeed, Dr. Blincow notes in his report that there "is no recorded record of any injury to the patient's right hip at the time of the [1944 left-knee injury]" (R. at 418) and that "[t]here is no mention of any injury to the right hip in the medical records" (R. at 419). It is not the province of the Court to speculate on the extent to which knowledge of Mr. Padgett's right-hip injury in service would have affected Dr. Blincow's medical conclusions; indeed, the materiality and relevance of that knowledge is itself a medical question. It is, however, axiomatic that without knowledge of Mr. Padgett's right-hip injury, Dr. Blincow's conclusions with regard to the etiology of Mr. Padgett's current right-hip

disability are necessarily based on incomplete information and rendered suspect. Accordingly, Dr. Blincow's conclusions with regard to Mr. Padgett's right-hip disability, having been made in the absence of a potentially material and relevant fact, are also of "questionable probative value." *Mariano*, 17 Vet.App. at 317; *see also Bielby*, *supra*; *Reonal v. Brown*, 5 Vet.App. 458, 461 (1993) ("opinion based upon an inaccurate factual premise has no probative value").

Despite the infirmities in the reports of Drs. Henderson and Blincow, and the lack of such infirmities regarding the opinions of Drs. Shaw and Thoburn, the Board found that the probative value of the opinions of Drs. Henderson and Blincow "far outweighed" the value of the opinions of Drs. Shaw and Thoburn. Based on this weighing of the evidence, the Board found that Mr. Padgett's right-hip injury was not secondarily service connected because the preponderance of the evidence was against that claim. R. at 18. However, given the little probative weight, if any, that can legally and reasonably be accorded the opinions of Drs. Henderson and Blincow, as opposed to the opinions of Drs. Shaw and Thoburn that strongly support secondary service connection for the right-hip injury, the finding of the Board that the evidence preponderated against this claim is simply not "plausible in light of the record viewed in its entirety," *Gilbert*, 1 Vet.App. at 52 (quoting *Anderson*, 470 U.S. at 574); *see also* 38 C.F.R. § 3.303(a) (2004) ("[d]eterminations as to service connection will be based on review of the entire evidence of record"), and the Court has "'the definite and firm conviction that a mistake has been committed.'" *Gilbert*, *supra* (quoting *U.S. Gypsum Co.*, *supra*); *see Mariano*, 17 Vet.App. at 314-17.

The only plausible resolution of the key factual issue on the record in this case is that Mr. Padgett's right-hip disability was aggravated by his service-connected left-knee disability, and the Board's decision that the evidence preponderated against this claim must therefore be, and will be, reversed. *See* 38 U.S.C. § 7261(a)(4) (Court must "reverse or set aside" clearly erroneous finding of material fact); *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) (reversal is appropriate where "the record permits only one resolution of the factual issue"); *Mariano*, *supra*; *see also Ortiz*, 274 F.3d at 1365 ("benefit of the doubt rule may be viewed as shifting the 'risk of nonpersuasion' onto the VA to prove that the veteran is not entitled to benefits"); *Robinette*, 8 Vet.App. at 76 ("a merits disallowance [is permitted] only where the evidence preponderates against the claim"); *Gilbert*, 1 Vet.App. at 54 ("the preponderance of the evidence must be against the claim for benefits to be denied"). Accordingly, Mr. Padgett's claim for disability benefits on the basis of a right-hip

22

disability secondary to his service-connected left-knee disability will be remanded for assignment of a disability rating and the effective date thereof. *See Fenderson v. Principi*, 12 Vet.App. 119, 127 (1999) (remanding for consideration of staged ratings in connection with initial award of service connection).

Finally, the Court notes that it would be an anomalous use of 38 U.S.C. § 7104(a), a provision designed to provide to VA claimants the benefit and protection of an administrative appeal process within VA, to deny meaningful judicial review in this Court. Such an aberrant shield-to-sword transformation, which was embraced by the now-withdrawn panel opinion that this full-Court opinion replaces, was addressed earlier in the consideration of this case, as follows:

> The right to "one review on appeal to the Secretary" provided in section 7104(a) is a process right guaranteed to VA claimants, not the Secretary who clearly has no right of appeal to this Court. To permit the appellant's process right to operate as a shield from the Court's review of the Board's arguably clearly erroneous denial of a claim is to stand the statute and common sense on their heads.

*Padgett v. Principi*, 18 Vet.App. 223, 226 (2004) (per curiam order) (Steinberg, J., dissenting to denial of full-Court decision) (citations omitted).

### B. Board Decision as to Direct and Presumptive Service Connection for Right-Hip Disability will be Remanded

The Board also denied Mr. Padgett's claims for disability benefits for a right-hip disability on direct and presumptive bases. In so doing, the Board discounted the favorable opinions of Drs. Shaw and Thoburn because they "appear[ed] to be largely based on Mr. Padgett's self-reported history of having sustained a right-hip injury in service." The Board relied upon, inter alia, its finding that "the most probative medical evidence on file" – the previously discussed faulty reports of Drs. Henderson and Blincow – failed to demonstrate that the right-hip injury was incurred in or aggravated by service or that the injury was manifested within one year after discharge from service. R. at 16-17.

At the outset, we note a serious incongruity in that the Board correctly accepts as true that Mr. Padgett injured his right hip during combat in World War II, *see* 38 U.S.C. § 1154(b); 38 C.F.R. § 3.304(d) (2004); *cf. Caluza*, *supra*, but then rejects as not probative the opinions of Drs. Shaw and Thorburn, in part, because they relied on Mr. Padgett's report that he had injured his right hip in service. R. at 16. Having accepted as true that Mr. Padgett injured his right hip during war, it was

error then to reject the reports of Drs. Shaw and Thorburn because they relied on that fact. *Cf. Bailey v. Derwinski*, 1 Vet.App. 441, 447 (1991) (reversing as clearly erroneous 1990 Board finding that arthritis of shoulder was due to aging process rather than trauma when 1988 Board had found that "almost identical evidence" as to arthritis of wrist showed arthritis to be posttraumatic in nature); *see also Otero-Castro v. Principi*, 16 Vet.App. 375, 382 (2002) (relying on *Bailey*, *supra*); *Thomas v. Principi*, 16 Vet.App. 197, 200 (2002) (citing *Bailey*, *supra*, for proposition that Board "must be reversed because inconsistent VA factfinding was reached in 'arbitrary and capricious' manner in violation of 38 U.S.C. § 7261(a)(3)(A)"). On remand, the Board may not assign diminished probative value to these reports on the basis that they relied upon Mr. Padgett's report of a hip injury during combat.

Moreover, as noted above, neither Dr. Blincow nor Dr. Henderson knew or understood that Mr. Padgett had actually or presumably injured his right hip during combat in World War II, as was accepted as true by the Board. *See* R. at 16. Without this information, these doctors ***could not*** (and did not) form an opinion regarding a nexus between the in-service incurrence of that injury and his current right-hip disability. *See Caluza*, 7 Vet.App. at 506 (service connection requires medical nexus between in-service incurrence or aggravation of injury and appellant's current disability). Accordingly, insofar as these reports relate to a direct- or presumptive-service-connection assessment, they have no probative value. *See Mariano* and *Reonal*, both *supra*.

Whereas with the secondary service-connection issue the record contains substantial evidence that Mr. Padgett's right-hip disability was secondary to his service-connected left-knee injury and the Board's decision that the evidence preponderated against that claim was clearly erroneous, warranting reversal, the record is silent as to a medical nexus between Mr. Padgett's current right-hip disability and the incurrence, either on direct or presumptive bases, of his right-hip injury in service. *See Caluza*, *supra*. Moreover, the necessary factual determinations cannot be made by this Court in the first instance. *See Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) (appellate tribunals are not appropriate fora for initial factfinding); *see also* 38 U.S.C. § 7261(c).

Accordingly, the decision of the Board as to Mr. Padgett's claim for disability benefits for his right-hip disability on direct or presumptive bases will be set aside and the matter remanded for readjudication and any additional development necessary. *See Bucklinger v. Brown*, 5 Vet.App. 435, 440 (1993) (remand is the appropriate remedy when the Board has failed to make necessary findings

24

of fact); 38 C.F.R. § 19.9 (2004) (requiring Board, when additional development is necessary, to remand to RO for further development or to direct Board personnel to undertake appropriate action).

### C. Remand Proceedings

On remand, Mr. Padgett will have the opportunity to present any additional evidence and argument in support of his claim, and the Board must consider any evidence and argument so presented. *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Court notes that Mr. Padgett is a combat veteran who is now 83 years old and has already waited over twelve years to have his claim finally decided. In light of this, judgment will be entered and mandate will issue 10 days after the date on which this opinion is issued. *See* U.S. VET. APP. R. 2 (suspension of rules), 35 (motion for reconsideration), 36 (entry of judgment), 41(a) (issuance of mandate); *see also Mariano*, 17 Vet.App. at 318 (same order regarding judgment and mandate). The Court expects that the Secretary will provide expeditious treatment of this matter on remand. *See* 38 U.S.C. §§ 5109B, 7112; *see also Vargas-Gonzalez v. Principi*, 15 Vet.App. 222 (2001).

### IV. CONCLUSION

On consideration of the foregoing, the August 8, 2002, decision of the Board with regard to Mr. Padgett's secondary-service-connection right-hip disability claim is REVERSED; the decision with regard to Mr. Padgett's presumptive and direct service-connection right-hip disability claims is SET ASIDE; and the entire matter is REMANDED for further proceedings consistent with this opinion.

REVERSED IN PART; SET ASIDE IN PART; and REMANDED.

HAGEL, *Judge*, concurring in part and dissenting in part: I join in the Court's opinion to the extent that it overrules the Court's precedents that "can be read to support the proposition that a Board finding [of fact] cannot be clearly erroneous unless the evidence against that finding is uncontroverted." *Ante* at 18. Reversal is not limited to instances where the evidence is uncontroverted in an appellant's favor – that limitation sets the bar prohibitively high. Rather, this Court can reverse a Board finding of fact when the Court possesses "a definite and firm conviction that a mistake has been committed." *Hersey v. Derwinski*, 2 Vet.App. 91, 94 (1992) (quoting *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). It is unfortunate that the uncontroverted-

evidence standard has crept into our jurisprudence, and I am pleased that the Court today emphatically eradicates that errant standard. That said, for the reasons provided below, I dissent from the Court's conclusion that VA medical opinions ordered by the Board pursuant to VA regulation 38 C.F.R. § 20.901(a) (2004) are exempt from an appellant's statutory right to "one review on appeal to the Secretary" provided for in 38 U.S.C. § 7104(a).

In *Disabled American Veterans v. Secretary of Veterans Affairs*, the Federal Circuit invalidated VA regulation 38 C.F.R. § 19.9(a)(2) (2002) because that regulation would have allowed the Board, "the only appellate tribunal under the Secretary," "to gather and consider evidence that had not been before the regional office without having to remand the case to the regional office "for initial consideration and without having to obtain the appellant's waiver." 327 F.3d 1339, 1347 (Fed. Cir. 2003) [hereinafter *DAV v. Sec'y*]. The Federal Circuit based its finding on section 7104(a), which provides that "all questions in a matter which . . . is subject to decision by the Secretary shall be subject to one review on appeal to the Secretary" and because, in its view, "[w]hen the Board obtains evidence that was not considered by the [regional office] and does not obtain the appellant's waiver, . . . an appellant has no means to obtain 'one review on appeal to the Secretary' because the Board is the only appellate tribunal under the Secretary." *Id.* In reaching this decision , the Federal Circuit then stated, in what can be characterized fairly as dicta, as follows:

> Furthermore, we note that when Congress intended to authorize the Board to obtain additional evidence without "one review on appeal to the Secretary," it knew how to do so. Congress has provided *express statutory authority* to permit the Board to obtain additional evidence, such as expert medical opinions in specific cases. *See, e.g.*, 38 U.S.C. § 5107(a) (2000) (authorizing Board to obtain medical opinions from the VA's Under Secretary for Health (formerly the Chief Medical Director)); 38 U.S.C. § 7109 (2000) (authorizing Board to obtain independent medical opinions from outside the VA); 38 C.F.R. § 20.901(a) (2002) (authorizing Board to obtain opinions from the Veterans Health Administration); 38 C.F.R. § 20.901(b) (authorizing Board to obtain medical opinions from the Armed Forces Institute of Pathology).

*Id.* at 1347-48 (emphasis added). In other words, the Federal Circuit in *DAV v. Sec'y* instructed us that the Board is prohibited from considering in the first instance evidence without either obtaining an appellant's waiver of regional office consideration of that evidence or express statutory authority to consider such evidence in the absence of a such a waiver.

First, I note that 38 U.S.C. § 5107(a) (2000) did not expressly authorize the Board to obtain medical opinions from VA's Under Secretary for Health and that the majority appears to concede as much. *See* 38 U.S.C. § 5107(a) (2000) (providing, prior to the enactment of the Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096, that "[t]he Secretary shall assist such a claimant in developing the facts pertinent to the claim"); *ante* at 9 ("[W]e note that section 5107(a) does not expressly authorize the Board to obtain or secure medical opinions."). I also note that VA is not Congress and that the regulation cited to by the Federal Circuit, 38 C.F.R. § 20.901 (a) and (b), cannot support the proposition for which they are cited, namely that "Congress has provided express statutory authority to permit the Board to obtain additional evidence, such as expert medical opinions in specific cases." *DAV v. Sec'y*, 327 F.3d at 1347; *see William Jameson & Co. v. Morgenthau*, 307 U.S. 171, 173-174 (1939) (noting that an administrative regulation does not equate to an Act of Congress).

As for section 7109, it appears that that statute is the only authority cited to by the Federal Circuit that can even arguably support the proposition that Congress permitted the Board to obtain expert medical opinions and to consider such evidence in the first instance without entitling an appellant to "one review on appeal to the Secretary." 38 U.S.C. § 7104(a). Nevertheless, even assuming for the sake of argument that Congress, in enacting section 7109, carved out an exception to the right of an appellant to one review on appeal to the Secretary, in my view Mr. Padgett's case does not implicate section 7109. The only way the majority can conclude that § 20.901 establishes an exception to section 7104 is to conclude that section 7109 provides adequate congressional authority for this regulation. Because the majority's decision is premised on the conclusion that section 7109 provides authority for the Board to obtain and consider VA medical opinions in addition to independent medical opinions, I cannot concur in that portion of the Court's opinion. Further, whether section 7109 establishes an exception to the principle expounded in *DAV v. Sec'y* in cases where independent medical opinions are requested and, if so, the parameters of such an exception would be more appropriately examined in a case where those issues are squarely presented. This is not such a case.

The majority's conclusion to the contrary turns solely on the existence in section 7109(a) of the nonessential phrase "in addition to that available within the Department." *Ante* at 10. In my view, the majority, in its rush to analyze the evidence and reach a conclusion with which I am in

27

sympathy, has adopted an interpretation of section 7109 that stretches the phrase "in addition to that available within the Department" too far. Congress, in section 7109 itself and in the legislative history underlying that statute, merely recognized that there existed, at the time that that statute was enacted, *preexisting* authority for the Board's practice of obtaining VA medical opinions – such authority was not *vested* in the Board by section 7109. The Senate committee's statement makes clear that "ample authority" for the Board's practice of securing a medical opinion from within VA already existed at the time of section 7109's enactment and that the Senate version of the bill, which ultimately became what is now section 7109, was therefore making "no reference to the Board securing an advisory opinion from the Chief Medical Director of VA." S. REP. NO. 87-1844 (1962), *reprinted in* U.S.C.C.A.N. 2585, 2586. In that regard, I note the existence of 38 U.S.C. § 212 (1962), which provided the Administrator (now the Secretary) with the authority "to assign duties . . . to such . . . employees as he may find necessary." It is beyond my comprehension that Congress would pass a statute whose purpose was to authorize that which was already authorized and to provide authority for a practice already supported by ample authority.

Artfully casting Congress as having "approved" of a preexisting practice or as having "sanctioned" such a practice does not transform what is in essence a recognition of then-preexisting authority into an instrument that grants such authority. *See Ante* at 10. As I read section 7109 and its legislative history, that section did one thing and one thing only; it authorized the Board to obtain medical opinions from experts who were *independent* of VA. The initiation of the legislative process that culminated in the passage of what is now section 7109 was motivated by a desire to combat a perception of VA bias and to "inspire, in the veteran, the confidence that his claim is receiving objective consideration." 108 CONG. REC. H5518 (Apr. 2, 1962) (statement of Rep. Lane). For that reason, in addition to those stated above, it strikes me as improvident to cite the very statute that authorized the Board to procure non-VA medical opinions as the authority for the Board to obtain VA medical opinions. That said, I do not question whether the Board is permitted to obtain VA medical opinions; I simply express my opinion that the authority vested in the Board by § 20.901(a) is not rooted in section 7109 but elsewhere, for instance § 20.901 cites as authority 38 U.S.C. § 5103A(d) in addition to section 7109. Because I do not believe that section 7109 is the authority that permits the Board to obtain VA medical opinions, because I see no reason to believe that section 5103A(d) establishes an exception to section 7104(a), and because no other statutory

authority has been advanced that would permit the Board to consider in the first instance Board-ordered VA medical opinions, an exception to section 7104(a)'s grant of "one review on appeal to the Secretary" is not implicated in the instant case. Absent such an exception, the Federal Circuit's decision in *DAV v. Sec'y* compels me to conclude that before the Board can consider a VA medical opinion that it orders pursuant to § 20.901, it must either obtain the claimant's waiver of regional office consideration of that evidence or remand the matter for regional office adjudication. *DAV v. Sec'y*, 327 F.3d at 1347.

The foregoing discussion leaves open the question of whether reversal is the appropriate remedy in this case. Reluctantly, I am compelled to conclude that it is not. Although I would tend to agree with the majority's evaluation of the evidence, because the Board was not permitted to consider Dr. Blincow's report without (1) Mr. Padgett's waiver of regional office consideration of that evidence or (2) remanding the matter for regional office adjudication, the Board's findings with respect to that report are void. It follows then that by evaluating Dr. Blincow's opinion, the majority is engaged in factfinding in the first instance, which it is prohibited by law from doing. *See* 38 U.S.C. § 7261(c); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) (stating that "appellate tribunals are not appropriate fora for initial factfinding"). If Mr. Padgett had wanted us to review the Board's factual conclusions with respect to Dr. Blincow's opinion, he could have so argued and could have waived regional office consideration of Dr. Blincow's opinion. If he had done so before us, it would not be inappropriate for us to review the Board's findings of fact with respect to that piece of evidence. However, he has not advanced such an argument nor made such a request. Specifically, he does not seek reversal based on a review of all of the evidence considered by the Board, but only a portion thereof – his argument for reversal is premised on his contention that the Court should exclude from consideration due to various alleged inadequacies or procedural defects VA medical opinions, including that of Dr. Blincow. Appellant's Brief (Br.) at 16-26; Reply Br. at 6-7. He has never argued for reversal based on a review of *all* the evidence of record, i.e., the totality of the evidence relied upon by the Board in rendering its decision. Regarding waiver, he was well aware of his ability to waive his right to a remand in order to have the Court reach the merits of his claim. In fact, he specifically waived consideration of any potential error with respect to deficient notice under the Veterans Claims Assistance Act (Reply Br. at 1-2) and his representative reaffirmed the limited scope of that waiver when questioned on the subject during oral argument.

Accordingly, this matter should be remanded to the Board and, in turn and absent a waiver by Mr. Padgett, by the Board to the regional office for initial adjudication based on the full record and after appropriate regional office action the opportunity for "one review on appeal to the Secretary," if Mr. Padgett should invoke that right in a timely fashion. 38 U.S.C. § 7104(a).

IVERS, *Chief Judge*, dissenting: Because Judge Hagel finds that the majority errs in its analysis regarding the applicability of *Disabled Am. Veterans v. Sec'y Veterans Affairs*, 327 F.3d 1339 (Fed. Cir. 2003), to this matter, while engaging in impermissible factfinding to reach its conclusion that reversal, rather than remand is the appropriate remedy, I join in his separate statement. However, I write separately to address my own concerns that, in its effort to reach a clearly sympathetic outcome, the majority ignores this Court's role as an appellate body, and parses the medical evidence of record to arrive at that outcome.

As Judge Hagel correctly states in his dissent, this Court, as an appellate body, is prohibited both by statute and longstanding precedent, from making initial findings of fact. *See* 38 U.S.C. § 7261(c); *Andre v. Principi*, 301 F.3d 1354 (Fed. Cir. 2002); *Elkins v. Gober*, 229 F.3d 1369 (Fed. Cir. 2000); *Hensley v. West*, 212 F.3d 1255 (Fed. Cir. 2000). The Federal Circuit has stated, with uncompromising clarity, that lest this Court become a factfinder, rather than a court of appellate review, "fact-finding is to be performed by the expert BVA", not by the judges of this Court. *Elkins*, 229 F.3d at 1377. Here, however, the majority determines that a mistake has been made, then goes well beyond the bounds of appellate jurisprudence, and engages in factfinding to support the credibility of its own findings in support of that determination. Rather than reviewing the Board's application of the law and arriving at its decision to reverse the Board's finding that the evidence preponderates against Mr. Padgett's claim for entitlement to service connection for osteoarthritis of the right hip on a secondary basis, and because "[it] is left with a definite and firm conviction that a mistake has been committed", *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990), the majority appears not only to review the evidence de novo, but also parses the evidence, substituting its judgment for that of the Board. *Ante* at 18-21. In order to reach its conclusion that reversal rather than remand is proper here, the majority must know with certainty that, but for the flaws in the VA examinations, the Board would have found in the appellant's favor. By weighing and discounting some of

30

evidence, the majority leaves only medical evidence favoring the appellant's claim. That evidence, by the Court's action, then becomes uncontroverted.

While I do not disagree with the majority's statement that "the existence of some controverting evidence . . . does not preclude this Court from carrying out the mandates in section 7261(a)(4) and (b)(1)", I must strongly disagree with the majority's treatment of our jurisprudence in both *Hersey v. Derwinski*, 2 Vet.App. 91 (1992), and *Hicks v. Brown*, 8 Vet.App. 417 (1995). The language in *Hicks* that reversal is the appropriate remedy when there is absolutely no plausible basis for the BVA's decision **and** where that decision is clearly erroneous in light of the uncontroverted evidence in the appellant's favor derives from our decision in *Hersey*, which had characterized the evidence in the appellant's favor as "uncontroverted" and did not add that criterion to the standards for a finding of "clearly erroneous." *Hersey* and *Hicks* were thereafter followed in a number of opinions requiring that the evidence in favor of the appellant be uncontroverted for reversal, an unanticipated result. *See*, *e.g.*, *Pentecost v. Principi*, 16 Vet.App. 124, 129 (2002); *Ardison v. Brown*, 6 Vet.App. 405, 409 (1994).

I agree with Judge Hagel that correcting the course of our jurisprudence where it appears to veer from its intended course is a welcome outcome of this matter and I concur in that correction, even though this is not an appropriate case in which to overrule *Hersey* or *Hicks*. The majority here eliminates the VA evidence against the claim on the bases that one opinion was based on an inaccurate premise and that the other was rendered without the appellant's claims file without regard to the entirety of the evidence of record. By parsing the evidence in this manner and ignoring the extenuating factors of the appellant's weight (described as variously as "obese" and "morbidly obese") (R. at 226-27, 325), medical and family history of degenerative arthritis (R. at 226, 230, 325, 340, 363, 418-20), the only remaining medical evidence favors of the appellant's claim, and, unlike both *Hersey* and *Hicks*, where the evidence was, indeed, uncontroverted, the evidence here truly becomes uncontroverted as a result of the Court's action. Because it would decide the case differently than the Board below, the majority, feeling that a mistake has been made, does not merely consider and weigh all of the evidence, it discriminates among the evidence and then reaches its result.

The majority's desire to elevate the concurrence in *Gilbert*, without expressly overruling *Gilbert*'s holding, is palpable, but this is not the case in which to do so. Even if we agree that the

31

concurrence in *Gilbert* should be given more weight, to do so by slighting our responsibility as an appellate court is wrong. In *Gilbert*, this Court adopted the definition of "clearly erroneous" put forward by the Supreme Court in *United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948), and in *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985). Since *Gilbert*, the Court has continued to apply this definition. *See Duenas v. Principi*, 18 Vet.App. 512, 519 (2004); *Burris v. Principi*, 15 Vet.App. 348, 353 (2001); *Bowling v. Principi*, 15 Vet.App. 1, 15-16 (2001); *Pond v. West*, 12 Vet.App. 341, 345 (1999); *Villano v. Brown*, 10 Vet.App. 248, 249-50 (1997); *Slater v. Principi*, 4 Vet.App. 43, 44 (1993) (per curiam order); *Hersey*, 2 Vet.App. at 94. While it may be appropriate and timely to reexamine *Gilbert*, the facts of this case do not lend themselves to doing so. Here again, the extenuating factors of the appellant's weight, medical and family history of degenerative arthritis complicate the evidence confronting both the Board below and this Court on appeal.

The majority's approach throughout this matter is illustrative of the danger inherent in applying the arguably subjective standard that, when "the reviewing court . . . is left with a definite and firm conviction that a mistake has been made," (*Gilbert*, 1 Vet.App. at 52) without the tempering effect of a review of the "entire" evidence and a recognition of the rarity of fact-finding in the appellate process.

Lastly, I note that the majority, without addressing the Court's longstanding rejection of the "Treating Physician Rule" (*see Winsett v. West*, 11 Vet.App. 420 (1998); *Guerrieri v. Brown*, 4 Vet.App. 467, 473 (1993); *Chisem v. Brown*, 4 Vet.App. 169, 176 (1993)), comes perilously close to its adoption by its approach to the appellant's private treating physicians. By failing to address the nonapplicability of the Treating Physician Rule, while appearing to apply it, the majority leaves in question the status of this Court's long-held position on this matter, and may, in fact, sub silentio, appear to overturn our previous holdings on this matter.